Filed 2/6/14  P. v. Stone CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

----

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MALACHITE LANCE STONE,<br><br>    Defendant and Appellant. | C071315<br><br>(Super. Ct. No. 10F04592) |

Defendant Malachite Stone, acting with two others, entered a house in Elk Grove, armed with a gun, and stole a small safe containing "lucky money" (money from relatives at birthdays and Chinese New Year) from an 11-year-old boy and his mother, whom they threatened to kill if they called the police.  A jury found defendant guilty of two counts of first degree robbery in concert (Pen. Code,[1] §§ 211; 213, subd. (a)(1)(A)) with firearm

---

[1] Further undesignated statutory references are to the Penal Code.

1

and on-bail enhancements (§§ 12022.53, subd. (b); 12022.1) and an enhancement in the second robbery for a victim under the age of 14 (§ 667.9), first degree burglary (§ 459), and being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury found true allegations that defendant had a strike prior (§ 667, subds. (b)-(i)) and had served a prison term (§ 667.5, subd. (b)). The court sentenced defendant to 44 years and 8 months in prison.

On appeal, defendant contends: 1) there was insufficient evidence of robbery of the mother; 2) it was prejudicial error to admit gang evidence; 3) the trial court erred in refusing a pinpoint instruction on the difficulties of cross-racial identification; and 4) there was cumulative error. We find that the trial court erred in admitting the gang evidence, but that the error was harmless. Accordingly, we affirm.

## FACTS

Su Quan lived with her sons Eric and Eddy in Elk Grove. On the afternoon of July 3, 2010, she was at home with Eric when an African-American woman rang the doorbell several times. Quan thought it was unusual, so she did not open the door. Then two African-American men came in through the back door and pointed guns at her. Their faces were covered and they wore gloves.

Terrified, Quan ran out the front door. One man chased her and she screamed for help. The man grabbed her and she struggled. He pulled her back into the house. She heard Eric upstairs call for her and defendant ran upstairs. The other man grabbed her so she could not leave.

Defendant went upstairs and demanded money from Eric. Defendant was wearing a hoodie and had a blue bandana over his face. Although Eric saw only eyes and part of a nose, Eric was able to identify defendant as the robber from a photographic lineup. Eric gave defendant a mini safe from his brother's closet. The safe contained about $5,000, money that relatives had given to Eric and Eddie on birthdays and Chinese New Year. The money was to be used for college.

2

Defendant ran downstairs and told Quan not to call the police or he would "come back to kill" her and her son. The two robbers left through the backyard.

Jamal Martin, a police officer from Illinois, was in the neighborhood visiting his family. That afternoon he was with his sister in her garage. He saw a gray or silver SUV pull up and park across the street. Later he saw two African-American men leave Quan's house and head to the car; one was carrying something. One man told him to "get in the house, cuz." The man repeated the order and pulled out a semi-automatic gun. Martin pushed his sister down. He got up, announced "police," and opened fire. He fired four or five rounds. The car took off before the last shot.

During that time period, defendant drove a silver or gray SUV Isuzu Rodeo that belonged to his mother. The police found that vehicle more than a week after the robbery in the backyard of Pierre Davenport, defendant's friend. The backyard fence was covered with blankets, hiding the view of the car from the street. Inside the Rodeo was a gym membership card in defendant's name. The rear of the Rodeo had sustained damage consistent with gunshots.

During the service of the search warrant at Davenport's, defendant arrived in a van belonging to his girlfriend (they later married). He then drove away and law enforcement stopped the van; defendant was driving and Davenport was with him. Defendant got out and put his hands up; he had two blue bandanas hanging out of his pocket. Inside the van was a cooler containing a gun. Quan had found a spent .45 casing in her front yard. Firearm analysis determined that the gun in the cooler had fired that casing. Police also found a luggage claim slip in defendant's name and a paper with rap lyrics in the van. The lyrics included the name "Shady" which was defendant's nickname, as well as the words "cuz" and "Crip smashing."

At trial, the People called Detective Robert Quinn as a gang expert. He testified that using the term "cuz" was synonymous with being a Crip gang member; the Bloods gang did not use that term. Saying "what's up, cuz?" to a stranger was announcing that

one is a Crip. Crips associate with the color blue and often have blue bandanas. Quinn explained that "flying your flag" means to have a blue bandana hanging out of the back pocket. The lyrics found in the van included Shady L.O.C.; L.O.C. stands for "[Al]legiance of Crips." The lyrics included other "gang lingo."

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant first contends there is insufficient evidence to sustain the robbery conviction relating to Quan. He argues the property was taken from Eric, not her, and she was unaware of the robbery until the property was taken. He further argues there was no evidence that Quan had the right to control the safe with the money in it.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

"California follows 'the traditional approach that limits victims of robbery to those persons in either actual or constructive possession of the property taken.' [Citation.] '"Robbery" is an offense against the person[.]' [Citation.] Accordingly, a victim can be any person who shares 'some type of "special relationship" with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner.' [Citation.] Persons with just such a special relationship include business employees and parents living with their adult children. [Citations.]" (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064-1065.) A special relationship has also been found between brothers who did not live together. (*People v. Weddles* (2010) 184 Cal.App.4th 1365, 1370 (*Weddles*).)

We find *People v. Gordon* (1982) 136 Cal.App.3d 519 (*Gordon*) dispositive. In *Gordon*, the defendants entered the Lopes residence by ruse, threatened Mr. and Mrs. Lopes with a firearm, and took drugs and money belonging to their absent adult son.

4

(*Gordon, supra,* at pp. 523-524.) There was no evidence that either parent physically possessed the items taken or even knew about them, and the only evidence to support a finding of possession was the couple's ownership of and residence in the home where the crime occurred. (*Id.* at p. 529.) The appellate court upheld the jury's determination that the parents were robbery victims who possessed their son's items for purposes of the robbery statute. (*Ibid.*) It reasoned that if employees were considered responsible for protection and preservation of their employer's property, such that they were victims in a commercial robbery, then "parents have at least the same responsibility to protect goods belonging to their son who resides with them in their home." (*Ibid.*)

Applying *Gordon,* Quan unquestionably had a special relationship with her two minor sons to protect their money and thus was a victim of the robbery. Defendant attempts to distinguish *Gordon* in his reply brief by arguing it is not necessary to apply the concept of constructive possession, because Eric possessed the property and was home to protect his property. We reject this argument. First, unlike the son in *Gordon*, Eric was a minor. Second, Eddy, the co-owner of the money, was not home. Third, in *Weddles,* we affirmed a conviction for two counts of robbery where both the owner of money and his brother were present. (*Weddles, supra,* 184 Cal.App.4th at pp. 1370-1371.)

Defendant argues the concept of constructive possession "is more appropriate" for business situations where the owner consciously give constructive possession to employees. We disagree that constructive ownership cannot apply in family situations. "We reject as untenable defendant's argument that [Quan] had no concern about whether [her sons'] savings were pilfered." (*Weddles*, *supra*, at p. 1370.)

II

*Admission of Gang Evidence*

Defendant next contends the trial court erred in admitting evidence showing his status as a member of the Crips criminal street gang. He contends the evidence was not

5

relevant to any disputed issue and was unduly prejudicial; it should have been excluded under Evidence Code section 352. We agree.

A. *Background*

Prior to trial, the People moved to admit gang evidence to prove defendant's identity as the perpetrator. They argued there was evidence that both defendant and the perpetrator were Crips. Defendant asked to be separated from Bloods in jail (this evidence was not presented at trial); further, he had blue bandanas when arrested and possessed writing that used the terms "cuz" and "Crip smashing." The robbers wore blue bandanas and one referred to Martin as "cuz" while pointing a gun at him. The People asserted that Crips are associated with the color blue and use the term "cuz." They argued the probative value of this evidence was high because it severely limited the pool of those who could be responsible for the crime.

At the hearing on the motion, the People argued that the word "cuz" was "specific to the gang"; other people used the word, but it was less likely. The defense argued that a lot of people used the term, including college students in northern Michigan; it was part of hip hop culture. The defense claimed the People were relying on what their gang experts learned 15 to 20 years ago. The court found it a "close question" and took the matter under submission.

Subsequently the trial court announced that how relevant the gang evidence was depended on how unique the term "cuz" was to the Crips. The court had looked at the Urban Dictionary on the Internet. The first definition was: "cousin, friend, brotha, homie/homey, and wuddup cuz." The second definition for "cuz" was a word Crips use for gang banging purposes; if a Crip sees someone who might be a rival gang member, he will use the word to announce he is a Crip. People can get killed for using "cuz" in the wrong area. The court ruled the evidence was admissible.

B. *The Law*

Evidence Code section 352 gives the trial court the discretion to exclude relevant evidence if the probative value of the evidence is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. (*People v. Harris* (2013) 57 Cal.4th 804, 845.) We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130.)

"'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Evidence of gang membership can evoke such a bias against defendant because it carries a real danger that the jury will infer that defendant has a criminal disposition and is therefore guilty of the offense charged. (*People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams); People v. Cardenas* (1982) 31 Cal.3d 897, 905 (*Cardenas*).) In cases, as here, not involving the gang enhancement, evidence of gang membership carries a substantial danger of undue prejudice and should not be admitted if its probative value is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*); *Cardenas, supra,* 31 Cal.3d at pp. 904-905.)

Evidence of defendant's gang affiliation, however, may be relevant and admissible to prove identity. (*Hernandez, supra,* 33 Cal.4th at p. 1049.) But "even where gang membership is relevant, because it may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it. [Citation.]" (*Williams, supra,* 16 Cal.4th at p. 193.)

C. *Analysis*

1. 352 Balancing

The trial court's analysis under Evidence Code section 352 was flawed. The court overstated the probative value of the gang evidence in establishing defendant's identity as

7

one of the robbers and ignored the significant potential for prejudice. As the absence of the gang enhancement indicates, there was no evidence the robbery was a gang crime or that the robbers were "gang banging." Without significant evidence that the robber was a Crip, evidence that defendant was a Crip had no relevance; the only potential for the evidence was to inflame the jury.

At the hearing, the People made no offer of proof that the term "cuz" was unique to Crips; the prosecutor simply stated that was so. The trial court, conducting its own research to fill the gap in the People's argument, found a dictionary definition (the second definition) indicating "cuz" was a Crip term. But the facts of this case do not fit within that definition. There was nothing to suggest the robber spoke to Martin believing he was a rival gang member and thus sought to establish the robber's identity as a Crip. Rather, it is just as likely the robber used the term "cuz" in the manner set forth in the first definition quoted by the trial court, as "cousin, friend, brotha, homie/homey, and wuddup cuz." Thus the robber's use of the term "cuz" was of limited probative value in showing that the robber was a Crip.

Similarly, the robber's use of a blue bandana to mask his identity is of limited probative value in establishing that the robber was a Crip. First, the robber used the bandana to hide his face; he did not "fly the flag" as did defendant. Second, there was no evidence that only Crips own blue bandanas. Finally, there was no evidence, such as the population of Crips in the area and their penchant, if any, to commit robberies, to indicate to what extent the field of potential suspects was narrowed by determining that the robber, like defendant, was a Crip.

Thus the probative value of the evidence purportedly admitted to show the robber was a Crip was extremely limited. Without evidence decisively establishing that the *robber* was a Crip, there was *no* relevance to evidence that *defendant* was a Crip.

In making its decision whether the gang evidence was unduly prejudicial, the trial court inexplicably focused on how important the evidence was to the People's case.

8

"[W]hether something is unduly prejudicial I think does turn ... on how important that evidence is when it's placed in context with all the other evidence in the case." The court, however, failed to mention the prejudicial effect of gang evidence as noted in cases cited *ante*. The potential prejudice of the gang evidence substantially outweighed its limited probative value. The trial court erred in admitting it.

### 2. Harmless Error

There was considerable evidence tying defendant to the robbery, even disregarding the evidence of gang membership. Eric positively identified defendant as the one who demanded money. Defendant drove a gray or silver SUV and Martin observed a similar car at the scene of the robbery. That car was found hidden in Davenport's backyard, showing a consciousness of guilt and further tying the car to defendant. Further, the SUV had gunshot damage to its rear, consistent with Martin's shooting at it. Defendant showed up at Davenport's (with Davenport) at the service of the search warrant; he was driving a van that contained a cooler with the gun that had fired the shell casing found at Quan's residence after the robbery inside. Defendant possessed blue bandanas when arrested; a black hoodie, similar to the one worn by the robber, was found with his luggage. Given the amount of direct and circumstantial evidence that defendant was one of the robbers, it is not reasonably probable that the jury would have reached a different result had the gang evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### III

### *Pinpoint Instruction of Cross-Racial Identification*

Defendant contends the trial court erred in refusing to give the defense pinpoint instruction on cross-racial identification. Defendant contends the instruction was necessary because he was African-American, while Eric, who identified him, was Chinese-American. Eric testified he had not had much interaction with African-American men.

9

A. *Background*

Defendant proposed giving an instruction on the difficulties in identifying a member of another race prepared by the American Bar Association. The instruction was as follows: "In this case, the identifying witness is of a different race than the defendant. You may consider, if you think it is appropriate to do so, whether the fact that the defendant is of a different race than the witness has affected the accuracy of the witness' original perception or the accuracy of a later identification. You should consider that in ordinary human experience, some people may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race. [¶] You may also consider whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness had sufficient contacts with members of the defendant's race that he would not have greater difficulty in making a reliable identification."

The trial court declined to give the pinpoint instruction, finding other evidence corroborated Eric's identification.

The court instructed the jury with CALCRIM No. 315 on the factors to consider in evaluating eyewitness identification. The instruction listed 15 factors to consider, including whether the witness and the defendant were of different races.

B. *The Law and Analysis*

A trial court is obliged to instruct, even without a request, on the general principles of law which relate to the issues presented by the evidence. (§§ 1093, subd. (f), 1127; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) A pinpoint instruction relates particular facts to a particular legal theory and "pinpoints" the crux of defendant's case, such as mistaken identification. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) A trial court is required to give a pinpoint instruction when defendant requests it and there is evidence that supports the theory. (*Ibid.*) A court need not, however, give a pinpoint

10

instruction that is argumentative or duplicative. (*People v. Harris* (2013) 57 Cal.4th 804, 853.)

"[A] proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the impact of each of the psychological factors listed. . . . Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge." (*People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*), original italics.) "We conclude that the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and that an explanation of the effects of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate. The instruction should list the applicable factors in a neutral and nonargumentative instruction, thus effectively informing the jury without improperly invading the domain of either jury or expert witness. It should list only factors applicable to the evidence at trial, and should refrain from being unduly long or argumentative." (*Wright, supra,* at p. 1143, fn. omitted.)

We have upheld CALCRIM No. 315 as a proper instruction on evaluating identification testimony. (*People v. Golde* (2008) 163 Cal.App.4th 101, 119.) The instruction, as given in this case, told the jury to consider the cross-racial nature of the identification, in the neutral manner required by *Wright*. If defendant wished to present the jury with information about the unreliability of certain eyewitness identifications, he could have presented expert testimony, which would have been subject to cross-examination, thus allowing the jury to determine its weight. (See *Wright, supra,* 45 Cal.3d at pp. 1153-1154.) The trial court did not err in refusing to give defendant's pinpoint instruction.

IV

*Cumulative Error*

Defendant contends the cumulative effect of the errors requires reversal. Because we have found only one error and that error was harmless, there was no cumulative prejudicial error and defendant received a fair trial. (*People v. Vieira* (2005) 35 Cal.4th 264, 305 [claim of cumulative error without merit where only one error].)

**DISPOSITION**

The judgment is affirmed.

      DUARTE      , J.

We concur:

      NICHOLSON    , Acting P. J.

      HOCH      , J.